1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11 | PETER BRUCE SELTSER,                )   Civil No. 12-CV-2590-LAB (WVG)
                                        )
12 |                   Plaintiff,        )   **REPORT AND**
   | v.                                 )   **RECOMMENDATION DENYING**
13 |                                    )   **PLAINTIFF'S MOTION FOR**
   | COMMISSIONER OF SOCIAL             )   **SUMMARY JUDGMENT AND**
14 | SECURITY,                          )   **GRANTING DEFENDANT'S**
   |                                    )   **CROSS-MOTION FOR**
15 |                   Defendant.        )   **SUMMARY JUDGMENT**
   |                                    )   [DOC. NOS. 10, 17]
16 | _____    )

17          On October 24, 2012, Plaintiff Peter Bruce Seltser (hereinafter "Plaintiff"), filed a

18   Complaint against the Commissioner of the Social Security Administration, Carolyn W.

19   Colvin[1] (hereinafter "Defendant"), appealing the decision of an Administrative Law Judge

20   ("ALJ") of the San Diego Office of Disability Adjudication and Review ("ODAR"), denying

21   his request for disability insurance benefits.  (Doc. No. 1.)

22          On February 4, 2013, Defendant filed an Answer to Plaintiff's Complaint.  (Doc. No.

23   7.)  On April 5, 2013, Plaintiff filed a Motion for Summary Judgment.  (Doc. No. 10.)  On

24   May 20, 2013, Defendant filed a Cross-Motion for Summary Judgment, and a Response in

25   Opposition to Plaintiff's Motion for Summary Judgment.  (Doc. Nos. 17, 18.)  On June 3,

26
27
_____
28          [1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February
     14, 2013.

1  2013, Plaintiff filed a Reply to Defendant's Response to Plaintiff's Motion for Summary

2  Judgment.  (Doc. No. 19.)

3      The Court, having reviewed Plaintiff's Complaint, Defendant's Answer, Plaintiff's

4  Motion for Summary Judgment, Defendant's Cross-Motion for Summary Judgment,

5  Defendant's Opposition to Plaintiff's Motion for Summary Judgment, Plaintiff's Reply, and

6  the Administrative Record filed by Defendant, hereby finds that Plaintiff is not entitled to

7  the relief requested and therefore RECOMMENDS that Plaintiff's Motion for Summary

8  Judgment be DENIED, and Defendant's Cross-Motion for Summary Judgment be

9  GRANTED.

10  **I. SUMMARY OF APPLICABLE LAW**

11      The Social Security Act, 42 U.S.C. § 401, et seq. ("the Act"), under which the Social

12  Security Administration ("SSA") provides benefits to certain disabled individuals, creates

13  a system by which the SSA determines who is entitled to benefits, and by which unsuccess-

14  ful claimants may seek review of adverse determinations.  Defendant, as Commissioner of

15  the SSA, is statutorily responsible for the administration of the Act.

16      **A. SSA'S FIVE-STEP SEQUENTIAL PROCESS**

17      Defendant administers several types of benefits under the Act, including benefits

18  based on disability.  The SSA utilizes a five-step sequential evaluation codified by SSA 20

19  C.F.R. § § 416.920, 404.1520, to determine whether a claimant is eligible for benefits.  To

20  qualify for disability benefits under the Act, a claimant must show that he or she suffers from

21  a medically determinable impairment that can be expected to result in death, or that has

22  lasted or can be expected to last for a continuous period of twelve months or more, and the

23  impairment renders the claimant incapable of performing the work that he or she previously

24  performed, or any other substantially gainful employment that exists in the national

25  economy.  See 42 U.S.C. § § 423(d)(1)(A), (2)(A); 1382(c)(3)(A).  A claimant must meet

26  both requirements to qualify as "disabled" under the Act.  Id.  The claimant bears the burden

27  of proving that he or she was either permanently disabled or subject to a condition which

28

12CV2590

became so severe as to create a disability prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

Step one in the five-step sequential evaluation process determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i).  If he is, disability benefits are denied.  20 C.F. R. §§ 404.1520(b), 416.920(b).  If he is not, the decision maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments.  That determination is governed by the "severity regulation," which provides in relevant part:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.  We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  Such abilities and aptitudes include, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" [u]se of judgment;" "[r]esponding appropriately to supervision, co-workers, and usual work situations;" and "[d]ealing with changes in a routine work setting."  Id.  If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which determines whether the impairment is equivalent to one of a number of listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.

Prior to step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  20 C.F.R § 404.1520(e).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  See 20 C.F.R. § 404.1520.  To determine the claimant's RFC, the ALJ must

1  assess relevant medical and other evidence and consider all of the claimant's impairments,

2  including impairments that are not severe.  20 C.F.R. § 404.1520(e), § 404.1545(a)(3).

3  If the claimant's impairment discussed in step three is not one that is conclusively

4  presumed to be disabling, the evaluation proceeds to the fourth step, where the ALJ

5  determines whether the claimant has the RFC to perform the requirements of his past

6  relevant work.  20 C.F.R. § 404.1520(f).  The term "past relevant work" means work

7  performed (either as the claimant actually performed it or as it is generally performed in the

8  national economy) within the last fifteen years, or fifteen years prior to the date that

9  disability must be established.  In addition, the work must have been substantial gainful

10  activity and have lasted long enough for the claimant to learn to do the job.  20 C.F.R. § §

11  404.1560(b), 404.1565.  If the claimant has the RFC to do his past relevant work, the

12  claimant is <u>not</u> disabled.  If the claimant is unable to do any past relevant work, or does not

13  have any past relevant work, the analysis proceeds to the fifth and last step.

14  At the last step of the sequential evaluation process, the ALJ must determine whether

15  the claimant is able to do any other work considering his RFC, age, education, and work

16  experience.  20 C.F.R. § 404.1520(g).  If the claimant is able to do other work, he is <u>not</u>

17  disabled.  20 C.F.R. § 404.1520(g).  If the claimant is not able to do other work and meets

18  the duration requirement, he is disabled.  20 C.F.R. § 404.1520(g).  Although the claimant

19  generally continues to have the burden of proving disability at this step, a limited burden of

20  going forward with the evidence shifts to the SSA.  In order to support a finding that an

21  individual is not disabled at this step, the SSA is responsible for providing evidence to

22  demonstrate that other work exists in significant numbers in the national economy that the

23  claimant can perform, given his RFC, age, education, and work experience.  20 C.F.R.

24  404.1512(f); 404.1560(c).

25  **B. SSA HEARINGS AND APPEALS PROCESS**

26  Under direct delegation from Defendant, the ODAR administers a nationwide hearings

27  and appeals program.  SSA regulations provide a four-step process for administrative review

28  of a claimant's application for Federal Disability Insurance Benefits ("DIB") and SSI

12CV2590

payments.  See generally 20 C.F.R. § § 404.900, et seq., 416.1400, et seq.  A decision is made at the initial, reconsideration, ALJ, and Appeals Council levels.  Id.  If the claimant is not satisfied with the decision at any step of the process, he has sixty days to seek administrative review.  See 20 C.F.R. 404.907, 404.929, 404.933, 416.1407, 416.1429, 416.1433.  If the claimant does not request review, the decision becomes binding.  See 20 C.F.R. § § 404.905, 416.1405.

Applications for disability benefits are initially processed through a network of SSA field offices and state disability determination services.  The process begins by a claimant completing an application and an adult disability report, and submitting the documents to one of SSA's field offices.  If the claim is denied, the claimant is entitled to a hearing before an ALJ in SSA's ODAR, where the ALJ will review the claim.  20 C.F.R. § 404.929.  The SSA employs ALJs to adjudicate claims under the Act for claimants who are not satisfied with the administrative determination of their case and have requested an administrative hearing.  20 C.F.R. § § 404.933, 416.1429.  Hearings before ALJs are informal and non-adversarial proceedings.  20 C.F.R. § 404.900(b).  The claimant may have an attorney or non-attorney act as his representative at the hearing, or the claimant has the option of representing himself.  20 C.F.R. § 404.900(b).  If the claimant receives an unfavorable decision by an ALJ, he may seek review by the Appeals Council.  20 C.F.R. § 416.1455.

The Appeals Council, also part of ODAR, acts on claimant requests for review of unfavorable decisions issued by ALJs.  The Appeals Council will either grant, deny, or dismiss a claimant's request.  If a claimant disagrees with the decision of the Appeals Council, or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court pursuant to 42 U.S.C. Section 405(g), Section 1383(c); See 20 C.F.R. § § 404.981, 416.1481.  The Appeals Council also has the power to review an ALJ's decision *sua sponte* within sixty days of the decision.  20 C.F.R. § 416.1481.  If a federal district court remands the claim, it will be sent to the Appeals Council, and remanded with instructions to an ALJ for further review.

12CV2590

## II. <u>PROCEDURAL HISTORY</u>

On September 18, 2006, Plaintiff filed an application for disability insurance benefits pursuant to the Act, alleging that he became disabled on September 23, 2003. (Tr. 604.) On February 8, 2007, Plaintiff's application was denied initially, and it was denied again on reconsideration on April 22, 2008. (Tr. 282, 320.)

On April 2, 2007, Plaintiff retained Mr. Christopher P. Doherty as counsel. (Tr. 323.) On May 12, 2008, Plaintiff requested an administrative hearing before an ALJ, and on October 16, 2008, ALJ Michael P. Breton held a video hearing on Plaintiff's case. (Tr. 282-289.) Plaintiff appeared in San Diego, California, and ALJ Breton presided over the hearing from Springfield, Massachusetts. (Tr. 282.) Plaintiff was represented by attorney Daniel Dolce at the hearing. <u>Id.</u> In a November 5, 2008, decision, ALJ Breton found that Plaintiff was not disabled. (Tr. 282-289.)

On February 6, 2009, the Decision Review Board ("Review Board") remanded Plaintiff's case back to ALJ Breton for further consideration. (Tr. 290-95.) The Review Board determined that the ALJ did not apply the appropriate grid rule for the period of time after Plaintiff reached age fifty, and failed to adequately evaluate transferability of work skills. (Tr. 292.) The Review Board also determined that there was evidence that Plaintiff's capabilities may have been underestimated in the RFC assessment, the ALJ's decision did not adequately address Plaintiff's earnings after the alleged disability onset date, and the decision did not contain an adequate evaluation of Plaintiff's mental impairment. (Tr. 293-294.)

On May 12, 2010, ALJ Breton held a second administrative hearing of Plaintiff's case. (Tr. 299.) Plaintiff was again represented by attorney Dolce. <u>Id.</u> At the hearing, Plaintiff

6

12CV2590

1   amended his alleged disability onset date to January 1, 2005.[2/]  Id.  On May 28, 2010, the

2   ALJ again determined that Plaintiff was not disabled.  (Tr. 300.)

3          On June 15, 2010, Plaintiff's counsel, Mr. Doherty[3/], drafted a letter to the Review

4   Board, requesting a review of ALJ Breton's second unfavorable decision.  (Tr. 426-429.)

5   The Review Board remanded Plaintiff's case for a third administrative hearing and directed

6   the ALJ to further evaluate Plaintiff's mental impairment, evaluate the treating and

7   examining source opinions related to Plaintiff's maximum physical and mental RFC and

8   provide rationale with specific references to evidence in the record, and obtain evidence from

9   a vocational expert ("VE").  (Tr. 316-317.)  In accordance with its policy not to remand a

10  case to the same ALJ twice, the Review Board directed that Plaintiff's case not be assigned

11  to ALJ Breton for the third hearing.  (Tr. 317.)

12         On January 13, 2011, Plaintiff received notice of a third hearing, set before ALJ

13  Rebekah Ross in the Boston ODAR.  (Tr. 447-451.)  On March 7, 2011, Plaintiff's attorney

14  notified ALJ Ross of a request to transfer Plaintiff's case to the San Diego ODAR because

15  Plaintiff had moved to San Diego several years earlier.  (Tr. 466, 475, 477.)

16         On July 29, 2011, ALJ Edward J. Steinman held a third administrative hearing of

17  Plaintiff's case in the San Diego ODAR.  (Tr. 22-34.)  Plaintiff testified at the hearing and

18  was represented by his attorney, Mr. Doherty.  (Tr. 22.)  Also appearing and testifying were

19

20

21

22         [2/] In his May 28, 2010, decision, ALJ Breton stated, "The claimant originally alleged disability beginning September 23, 2003; the Decision Review Board noted the claimant

23  returned to work in February 2004 and, following surgery in March 2004, he worked from April through August 2004.  The claimant    retired from work in December 2004.  The

24  claimant has posted earnings totaling $87,900.00 for 2004.  At the hearing, the claimant knowingly amended the alleged onset date of disbality to January 1, 2005." (Tr. 299.)

25

26         [3/] In a June 15, 2010, letter to the Review Board, Plaintiff's counsel, Mr. Doherty, stated that the May 28, 2010, decision "was addressed incorrectly to Dan Dolce as the

27  attorney of record...Please note that future correspondence should be mailed to Christopher P. Doherty..." (Tr. 426.)  The fee agreement between Plaintiff and Mr. Doherty is included

28  in the administrative record.  (Tr. 323.)

12CV2590

Dr. C. Richard Johnson[4/], an impartial medical expert, and Mary Jesko, an impartial vocational expert. (Tr. 22, 215, 543, 546.) At the July 29, 2011, hearing, Plaintiff amended his disability onset date to March 20, 2009, his fifty-fifth birthday. (Tr. 23.)

On August 31, 2011, ALJ Steinman issued a decision finding that Plaintiff was not disabled at any time between the alleged disability onset date and the date last insured, which was December 31, 2009.[5/] (Tr. 23, 608.)

On August 29, 2012, the Appeals Council declined to review the ALJ's decision. (Tr. 1.) Therefore, ALJ Steinman's August 31, 2011, decision became the final decision of the Commissioner. (Tr. 1-6; 22-34.)

On October 24, 2012, Plaintiff commenced the instant action for judicial review pursuant to 42 U.S.C. Section 405(g). (Doc. No. 1.) On February 4, 2012, Defendant filed an Answer to Plaintiff's Complaint. (Doc. No. 7.) On April 5, 2012, Plaintiff filed a Motion for Summary Judgment ("MSJ"), alleging that the ALJ's decision to deny disability benefits is not supported by substantial evidence. (Doc. No. 10 at 1.) On May 20, 2013, Defendant filed a Cross-MSJ, claiming that the ALJ's decision is supported by substantial evidence and Plaintiff is not entitled to disability benefits. (Doc. No. 17-1 at 2, 17-18.) On June 3, 2013, Plaintiff filed a Reply to Defendant's MSJ Response. (Doc. No. 19.)

## III. STATEMENT OF FACTS

### A. GENERAL BACKGROUND

Plaintiff, born on March 20, 1954, worked as a public adjuster for over thirty-two years. (Tr. 349, 692.) He was the owner and president of his own firm. (Tr. 481, 692.) On September 29, 2003, Plaintiff was involved in a boating accident and injured his right knee. (Tr. 952.) He banged his right knee on the floor of the boat, which caused a fractured right

---

[4/] ALJ Steinman's Decision states that Joseph E. Jensen, M.D., testified at the July 29, 2011, hearing. (Tr. 22.) However, it was Dr. Johnson who testified as an impartial medical expert. (Tr. 215.) The identification of Dr. Johnson as Dr. Jensen in the ALJ Decision is obviously a mistake. The record also contains a letter from SSA to Dr. Jensen, requesting him to appear and testify at Plaintiff's hearing. (Tr. 548.)

[5/] ALJ Steinman found that Plaintiff's earnings record showed that he had acquired sufficient quarters of coverage to remain insured through December 31, 2009. (Tr. 23.)

patella, torn patella tendon and meniscus, and significant fluid accumulation. (Tr. 369, 952.) Plaintiff was placed in a knee brace, but alleged that he continued to suffer from severe pain and swelling. (Tr. 369.)

On October 13, 2003, Plaintiff underwent knee surgery performed by Dr. Brian McKeon. (Tr. 770, 952.) During post-operative rehabilitation, Plaintiff continued to experience pain, swelling, and decreased range of motion. (Tr. 370.)

On November 18, 2003, Plaintiff attempted to return to work while still on crutches. (Tr. 370.) He alleges that he had extreme difficulty performing not only the daily administrative and physical duties of his job, which included inspection visits to sites of damaged property and ambulating over uneven terrain, but also claimed that he was becoming increasingly frustrated, irritable, and angry. Id. Plaintiff alleges that he was damaging professional and business relationships. Id.

In November of 2003, Plaintiff began treatment with psychiatrist Lionelle D. Wells, M.D., for depression secondary to his knee injury. (Tr. 371.) Dr. Wells noted that Plaintiff's depression initially improved with the assistance of the medications Remeron and Ambien, but he suffered a relapse after attempting to return to work. Id.

On February 9, 2004, an MRI showed a tear of Plaintiff's meniscus. (Tr. 370.) Plaintiff worked intermittently until he underwent a second knee surgery with Dr. Brian McKeon on March 10, 2004, which included hardware removal from his right knee. (Tr. 370, 952.) Plaintiff subsequently developed a hematoma and underwent a third knee surgery with Dr. McKeon on March 16, 2004. (Tr. 370, 952.) In June of 2004, he experienced quadriceps atrophy and weakness, and was positive for patellofemoral crepitus.[6] (Tr. 370.) Plaintiff was referred back to physical therapy. Id. His condition appeared to slightly

---

[6] Patellofemoral crepitus is a painful grating sensation that may be experienced on the palpation of the knee joint when extending the leg against gravity. http://www.ask.com/question/what-is-patellofemoral-crepitus

1  improve with the physical therapy, and he was diagnosed with post-traumatic
2  chondromalacia.[7/]  Id.

3        Plaintiff last physically worked in his office on March 24, 2004,[8/] although he did
4  some "minor and sparse work" in May and June of 2004. (Tr. 371.) On December 31, 2004,
5  Plaintiff officially retired when his business partner bought him out of the business. (Tr.
6  371, 626-628, 952.)

7        On January 27, 2005, another MRI of Plaintiff's knee showed degenerative changes
8  of his patella cartilage. (Tr. 372.) Around this time, Plaintiff's psychiatrist began
9  prescribing Ambien to help him sleep through the alleged constant pain at night. Id. In
10 January of 2007, Plaintiff was treated in a Florida hospital for exacerbated knee pain. Id.
11 X-rays showed chondromalacia and arthritis. Id.

12       Early in 2006, while riding his bicycle during physical therapy, Plaintiff fell and
13 injured his right wrist and right hip. (Tr. 372.) He suffered a stress fracture of the right wrist
14 and was placed in a cast. (Tr. 372.) In May of 2007, Plaintiff underwent surgery on his
15 wrist. (Tr. 372.) On March 24, 2009, he had a second wrist surgery. Id.

16    **B. MEDICAL HISTORY**

17       **1. VOCATIONAL PSYCHOLOGIST DR. EMMANUEL GREEN**

18       In August of 2004, Dr. Emmanuel Green, psychologist, began providing Plaintiff with
19 vocational counseling and consultation services. (Tr. 980, 987.) Dr. Green referred to his
20 sessions with Plaintiff as "vocational counseling." (Tr. 987.) Dr. Green wrote, "It is at this
21 point I was brought into the case to assist [Plaintiff] in determining whether or not he had
22 the functional capacity, once he completed treatment, to return to work as an Adjuster." (Tr.

23
24       [7/] Chondromalacia patella refers to the softening and breakdown of the cartilage under
   the kneecap which causes anterior knee pain. (Doc. No. 17-1 at 6, n. 2; citing MedlinePlus,
25 updated by Linda J. Vorvick, M.D., C. Benjamin Ma, M.D., and reviewed by David Zieve,
   M.D. http:...www.nlm.nih.gov/medlineplus/ency/article/00452.htm.

26
27       [8/] The record is conflicting as to when Plaintiff stopped working. On his application
   for disability insurance benefits, Plaintiff stated, "I have been disabled ever since the
28 accident on September 23, 2003. I have not worked since this date." (Tr. 604.) Elsewhere
   in the record, it is noted that Plaintiff has not performed any work since September of 2004,
   while also noting that Plaintiff stopped working on December 31, 2004. (Tr. 377, 692.)

12CV2590

987.) Further, Dr. Green wrote, "I have seen him in vocational counseling from August 2004 to the present time examining various issues, the main purpose of which was to assist him in evaluating his continuing work as an Adjuster." Id.  In a letter dated March 29, 2007, Dr. Green wrote, "I have been evaluating [Plaintiff] for a vocational impairment following 'knee injury,'" and "...in our vocational counseling, we discussed various vocational issues." (Tr. 982.)

Dr. Green held weekly face-to-face meetings with Plaintiff in his Massachusetts office from August of 2004 until May of 2006. (Tr. 980.)  Dr. Green moved to Florida and began holding sessions with Plaintiff via telephone. Id.  In a letter, Dr. Green notes that the telephonic sessions lasted until October of 2006, but contradicts himself by stating that from January 2006 through April 2007, they continued face-to-face sessions in Florida. Id.  Dr. Green opined that Plaintiff's primary problem was related to his orthopedic condition and consequent pain symptoms. (Tr. 981.)  He noted that Plaintiff had become "functionally autonomous and when combined with the other aspects of his physical and psychological problems has directly influenced his very existence." Id.  He opined that Plaintiff was unable to return to work as a Public Adjuster, and also noted a "total inability to function in the world of work." Id.

## 2. ORTHOPEDIC SURGEON DR. BRIAN MCKEON

Dr. Brian McKeon, orthopedic surgeon, performed three knee surgeries on Plaintiff. (Tr. 770, 820, 952.)   In the record, Dr. McKeon is referred to as Plaintiff's primary orthopedic surgeon. (Tr. 899.)  On June 22, 2004, Dr. McKeon wrote, "[Plaintiff] feels he wants to retire from his job based on his knee secondary to his discomfort and pain." (Tr. 757.)  On September 14, 2004, Dr. McKeon wrote his opinion that, as long as Plaintiff kept his quadriceps strong, maintained diligent use of anti-inflammatories and icing as needed, he should be "reasonably well." (Tr. 756.)
On January 27, 2005, Dr. McKeon noted that Plaintiff continued to complain of knee pain, and that Plaintiff "[b]asically retired because of persistent pain and inability to really mentally focus on task at hand." (Tr. 755.)

11

On December 6, 2005, Dr. McKeon noted,

> [Plaintiff] is doing very well.  He has had a definite turn around in his life mentally and that has clearly helped his knee.  He has baseline crepitus and small effusion but otherwise is doing very well.  We will put him on primary restrictions of no repetitive squatting or kneeling or bending, but otherwise, he is going to be functional and do think he can increase his activities as needed.

(Tr. 837.)

### 3. **PHYSICIAN DR. TAL DAVID**

In February of 2008, Plaintiff began treatment with Dr. Tal David, physician, after complaining of continued knee and lower back pain.  (Tr. 372, 920.)  X-rays of Plaintiff's knee revealed degenerative changes, and an MRI on February 21, 2008, showed multi-level degeneration and disc bulges from T12 to S1, with some stenosis.[9]  (Tr. 372, 920.)  On February 17, 2009, Dr. David noted a positive straight leg raise test, suggested an epidural injection, and referred Plaintiff to neurologist Charles Jablecki, M.D., because of weakness and atrophy in his right quadriceps muscle, and for an electrodiagnostic study.  (Tr. 373, 998-999.)  The results of Dr. Jablecki's study were normal.  (Tr. 999.)

In a February 26, 2008, note, Dr. David indicated that he told Plaintiff to participate in physical therapy and take Medrol Dosepak.  (Tr. 944.)  However, on March 26, 2009, Dr. David noted that Plaintiff had not done physical therapy or taken the Medrol Dosepak.  (Tr. 942.)

In April of 2010, Dr. David completed a Physical Capacities Evaluation of Plaintiff.  (Tr. 1051-1056.)  The Evaluation was a five page form in which Dr. David checked boxes and circled choices to indicate the extent of Plaintiff's abilities and limitations.  (Tr. 1052-1056.)  On the Evaluation form, Dr. David circled that Plaintiff could sit for less than one hour per day, stand for less than one hour per day, and walk for one hour per day.  (Tr. 1052.)

---

[9] A stenosis is an abnormal narrowing in a blood vessel or other tubular organ or structure.  http://en.wikipedia.org/wiki/Stenosis

12CV2590

### 4. PSYCHIATRIST DR. LIONELL WELLS

Plaintiff referred to psychiatrist Dr. Lionell Wells as, "[m]y treating psychiatrist." (Tr. 977, 983.)  On November 10, 2000, prior to Plaintiff's knee injury, Dr. Wells noted that Plaintiff's workload, along with having to get a restraining order against someone, had overburdened him in April and May of that year. (Tr. 855.)  He also noted that Plaintiff had been depressed in the past year, but was improving.  Id.  There were no medications indicated at the time, and Dr. Wells did not write Plaintiff any new prescriptions.  Id.

On April 27, 2006, and May 23, 2006, Plaintiff visited Dr. Wells and complained of increased anxiety and depression. (Tr. 856.)  Dr. Wells noted that Plaintiff had concerns and anxiety about his recent bike accident.  Id.

### 5. ORTHOPEDIC SURGEON DR. GEOFFREY J. VAN FLANDERN

On June 12, 2007, Dr. Geoffrey Van Flandern, orthopedic surgeon, wrote that he "disagreed mildly" with Dr. McKeon as to Plaintiff's functional capacity. (Tr. 898.)  In Dr. Van Flandern's opinion, Plaintiff could sit for 6 hours intermittently with frequent breaks, stand for 2 hours intermittently, and walk.  Id.  He opined that Plaintiff should not stoop, squat, kneel, or walk on uneven surfaces.  Id.  In his report, under "Past Medical Problems," Dr. Van Flandern noted, "[r]eally just some anxiety." (Tr. 899.)

### 6. PSYCHIATRIC CONSULTATIVE EXAMINATION WITH DR. DOUGLAS ENGELHORN

On June 16, 2011, Plaintiff was seen in psychiatric consultation with Dr. Douglas Engelhorn, consultative examiner and Diplomate on the Board of Psychiatry and Neurology. (Tr. 1070-72.)  Dr. Engelhorn reviewed Dr. Green's reports, as well as a depressive and anxiety inventory from 2007. (Tr. 1070.)  Dr. Engelhorn noted that Plaintiff was not currently receiving any type of medical or psychiatric treatment and that his only medication was Motrin. (Tr. 1071.)  He noted that Plaintiff described recurrent episodes of depression, but had never been psychiatrically hospitalized.  Id.  Dr. Engelhorn reported no psychotic symptoms and noted that Plaintiff did not appear to want any future psychiatric treatment or medication for depression.  Id.

12CV2590

1    Dr. Englehorn's examination revealed that Plaintiff was alert and cooperative with

2  normal speech, pleasant and polite, animated at times, had logical thinking and made good

3  eye contact, was oriented in all spheres with no cognitive impairment, had adequate

4  concentration and attention, and intact insight and judgment.  (Tr. 1072.)  Dr. Engelhorn

5  found no evidence of psychomotor retardation, flat affect, loosening of associations,

6  delusions, hallucinations, or psychosis.  Id.  He also found no evidence of excessive levels

7  of anxiety, and opined that Plaintiff did not come across as being particularly depressed, but

8  was briefly tearful on one occasion when he seemed concerned about his future.  Id.  He

9  diagnosed Plaintiff with major depression, recurrent type, mild form, and assessed a current

10  Global Assessment of Functioning ("GAF")[10/] score of 70.  Id.

11    Dr. Englehorn opined that Plaintiff could perform both simple, repetitive tasks, and

12  complex, detailed work, relate to peers and supervisors in the workplace, and make routine

13  adjustments in the workplace.  (Tr. 1073.)  He reported that Plaintiff had a tense affect and

14  mildly depressed mood, but clear, coherent and fluent speech, linear and well organized

15  thought form, normal thought content, intact fund of knowledge, good insight and

16  judgement, coherent and logical responses, intact attention and concentration, and intact

17  memory.  Id.  He noted that Plaintiff's mental functional limitations, if any, were mild.  (Tr.

18  1074-1075.)  Dr. Engelhorn noted that he "did not see significant psychiatric disability in this

19  case," as the disability related "almost totally to [Plaintiff's] orthopedic problems involving

20  his right leg which cause chronic pain, ambulation problems and difficulty with sitting for

21  long periods of time."  (Tr. 1073.)

22

23

24

25    _____

26    [10/] A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning but also indicates that the person is generally functioning

27  pretty well and has some meaningful interpersonal relationships; if symptoms are present in an individual with a GAF score of 71-80, they are transient and expectable reactions to psychosocial stressors and indicate no more than a slight impairment in social occupational,

28  or school functioning. (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders. [p. 32] (4th ed. 1994) (DSM-IV).)

### 7. ORTHOPEDIC MEDICAL EXPERT DR. C. RICHARD JOHNSON

At the hearing, Dr. C. Richard Johnson, orthopedic medical expert, testified that, after reviewing Plaintiff's record, it was his opinion that Plaintiff could sit for a total of 4 hours in an 8 hour workday with the opportunity to change position every 30 minutes at the worksite. (Tr. 217.) Dr. Johnson also testified that Plaintiff could stand and walk for a total of 4 hours in an hour 8 workday. Id. He further testified that Plaintiff could occasionally manage stairs, ramps, and could occasionally stoop and crouch. (Tr. 218.) He testified that Plaintiff should be precluded from ladders and unprotected heights, but could occasionally walk on uneven terrain, occasionally operate pedals with the right foot, and frequently with the left foot. Id.

### 8. ORTHOPEDIC EVALUATION WITH DR. THOMAS SABOURIN

On June 23, 2011, Plaintiff underwent an orthopedic evaluation with Dr. Thomas Sabourin, a board certified orthopedic surgeon. (Tr. 26.) During the examination, Plaintiff described pain in the low back, right knee, and wrist.[11] Id. Examination of Plaintiff's legs revealed what appeared to be some atrophy of the right thigh, which was two centimeters smaller than the left. Id. Plaintiff had generalized tenderness of the knee. Id. Dr. Sabourin's assessment was mild degenerative disk disease, multilevel, of the lumbar spine, fracture of the right patella with subsequent development of mild degenerative arthritis of that knee, status post debridement, and right ulnar wrist pain. Id.

Dr. Sabourin noted that the severity and duration of Plaintiff's complaints were somewhat out of proportion to the determinable condition. (Tr. 1083.) Specifically, he wrote that Plaintiff's gesturing and withdrawal with light touch to the low back revealed a disproportion between Plaintiff's subjective complaints and objective findings. Id. Dr.

---

[11] At the hearing, Plaintiff did not mention any problems with his wrist, nor did he cite wrist pain as contributing to his alleged disability. (Tr. 30.) Rather, Plaintiff testified that he could not work because of pain in his low back, right quadriceps, and right calf. (Tr. 28, 195-198, 210.)

12CV2590

1    Sabourin observed that Plaintiff would not do any forward flexion or any extension at all

2    because he said it would hurt too much.  (Tr. 1080.)  However, Dr. Sabourin noted that, in

3    the course of handing over documents to read, Plaintiff would bend approximately sixty

4    degrees and was able to sit on the examination table with his legs straight out in front of him.

5    Id.

6          **C. SAN DIEGO ODAR HEARING BEFORE ALJ STEINMAN**

7          At the July 29, 2011, hearing before ALJ Steinman, Plaintiff testified that he could not

8    work because of pain in his low back, right quadriceps, and right calf.[12]  (Tr. 28, 195-198,

9    210.)  As to each, Plaintiff testified that the pain is constant, and he takes Motrin, an over-

10   the-counter medication.  (Tr. 28.)  Plaintiff also testified that he has emotional problems and

11   has gone through a personality change since his knee injury.  Id.  He testified that he has

12   difficulty paying attention, gets angry and fights with people, has a lot of angst, cannot cope,

13   and his memory is impaired.  Id.

14         Plaintiff testified that his daily activities include playing the guitar, dressing and

15   feeding himself, assisting with light chores, preparing meals, and folding laundry.  (Tr. 30,

16   204, 207.)  He testified that he occasionally washes dishes, shops for groceries, and is able

17   to drive a car.  (Tr. 30, 204.)  Further, Plaintiff testified that he rides a bicycle, runs errands,

18   goes to Home Depot, occasionally attends a  synagogue, reads, writes, and watches

19   television.  (Tr. 30, 204-207.)

20         Plaintiff testified that he is unable to sustain full time work, 8 hours a day, 5 days a

21   week.  (Tr. 28.)

22                    **IV. ALJ'S FINDINGS**

23         ...

24         **After careful consideration of the entire record, the undersigned finds that,
       through the date last insured and up to the present, the claimant had the
       residual functional capacity to lift and carry 20 pounds occasionally and**

25

26   _____

27   [12] At the hearing, Plaintiff did not mention any problems with his wrist, nor did he cite
     wrist pain as contributing to his alleged disability.  (Tr. 30.)  However, the ALJ incorrectly
     summarized Plaintiff's testimony at one point during the   hearing stating, "[h]e indicates he
28   could not sustain work on a full-time basis due to his right knee, his back, and the pain
     modality that he has to incur."  (Tr. 244-245.)

12CV2590

**10 pounds frequently, sit for 4 hours of an 8-hour day with the opportunity every 30 minutes to change position for 5 minutes with a sit stand option, and to stand and walk for 4 hours out of an 8-hour workday. The claimant can occasionally climb stairs and ramps and can occasionally stoop and crouch. He is precluded from kneeling, climbing ladders and squatting and must avoid heights. He can walk on uneven terrain occasionally. He can operate foot pedals on the right occasionally but is able to do so with the left frequently. He can frequently perform gross and fine movement with his upper extremities, has no limit on feeling, can reach frequently. Occasionally, he is able to reach overhead bilaterally but with the right upper extremity, he is precluded from forceful grasping or torquing with hand tools such as wrenches.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

...

...[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limited effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that he could not work because he has pain in his low back, right quadriceps and right calf.[13] As to each, he said he experiences the pain every day; it is constant. On a scale of 1-10, he said that the back pain is between 7-9. He said he takes Motrin, an over-the-counter medication. To attempt to alleviate the pain, he lies down, ices his back and elevates. He does this three times a day for about 25 minutes. He further testified that the pain in his quadriceps and his calf is the same, i.e., 7-9 on a 10-point scale and he follows the same regime with respect to these body parts. The claimant stated that he has emotional problems. He has a difficult time paying attention. He finds that he gets angry with people and fights with them. He said he has a lot of angst. He stated he is not the same person he used to be. He cannot cope and is forgetful. His memory is impaired. On each occasion, he will spend about 1.5 hours in his room. He testified that Dr. Green has treated him for this condition. He talks to Dr. Green 2-3 times a week. The claimant said that he could lift a gallon of milk, sit for about 15-20 minutes, stand for a total of 1.5 hours in an 8-hour period, stand and/or walk for 20-30 minutes for a total of

---

[13] At the hearing, Plaintiff did not mention any problems with his wrist, nor did he cite wrist pain as contributing to his alleged disability. (Tr. 30.) However, the ALJ incorrectly summarized Plaintiff's testimony at one point during the hearing stating, "[h]e indicates he could not sustain work on a full-time basis due to his right knee, his back, and the pain modality that he has to incur." (Tr. 244-245.)

12CV2590

about 2 hours in an 8-hour day. He said he could not sustain full-time work, 8-hours a day, 5 days a week. The claimant also said that Dr. Tal[14/] told him he should elevate his leg when the pain gets to a certain level. He said he has undergone a personality change.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The weight of the objective evidence does not support the claimant's claims of disabling limitations to the degree alleged.

The medical evidence of record does not support the claimant's allegations of disabling mental impairment. He relies primarily on statements provided by Dr. Green, his alleged "psychologist." However, there are problems with the evidence provided by Dr. Green. First, there is a significant question as to whether Dr. Green is a licenced clinical psychologist. Dr. Green's letterhead states that he is a diplomate in the American Board of Vocational Experts (Exhibit 29F). At the hearing, the undersigned asked the claimant's representa-tive to provide information showing that Dr. Green is a licensed clinical psychologist. While Dr. Green wrote that he is still a licensed psychologist, nothing in his recent letter identifies him as a clinical psychologist, i.e., someone who provides psychotherapy to patients (Exhibit 45F). Moreover, even if Dr. Green were a licensed clinical psychologist, he has failed to provide any treatment records that support his conclusions that the claimant is unable to work or has marked limitations in mental functioning (Exhibit 36F). Dr. Green's only recent treatment of the claimant appears to have been by telephone (Exhibit 36F). Added to the above is the fact that the claimant takes no medication for his alleged mental health condition and there is no evidence he has ever been hospitalized for depression, anxiety or any other mental problem. The undersigned has found the claimant's mental impairment to be nonsevere. This conclusion is supported by the above, and by the opinion of consultative examiner, Douglas Engelhorn (Exhibit 43F/5).

The claimant's reasons for not seeking out a therapist in California, now that he has moved here, are not credible. He said he has not done so because he has a hard time talking to people and does not know anyone. However, the record clearly indicates that he has sought out and seen doctors for treatment of his other alleged conditions (e.g. Exhibits 31F, 32F, 37F/3, 39F/2) and apparently has had no trouble talking to them.

There is no evidence in the record since the amended alleged onset date of a calf impairment and/or treatment or diagnostic tests for a calf impairment.

The claimant's testimony regarding the use of a computer is not credible. At first he said when he stopped working in 2004 that he used it "very little" but then changed his testimony to say that he never used one. He said he had a computer in his office but he never used it. The undersigned finds this to be unlikely to the point of not being truthful, particularly in light of his testimony.

---

[14/] The ALJ erroneously referred to Dr. Tal David as Dr. Tal. (Tr. 28.)

12CV2590

There is no evidence that the claimant needs to elevate his right leg.  The only reference to that requirement is in the residual functional capacity assessment of Dr. David (Exhibit 38F/2).  None of Dr. David's records support the need to elevate the leg.  Moreover, it is contradicted by the testimony of Dr. Jensen and it is not a requirement of the residual functional capacity assessment outlined by Dr. Sabourin based on his recent examination of the claimant (Exhibit 44F).

Nothing in the record supports the claimant's assertion that he must lie down three times a day for 25 minutes each time.

The consultative examiner noted that the severity and duration of the claimant's complaints were somewhat out of proportion to the determinable condition.  His gesturing and withdrawal with light touch to the low back, revealed a disproportion between subjective complaints and objective findings (Exhibit 44F).  Interestingly, the claimant would not do any forward flexion or any extension at all, telling the orthopedic consultant that it would hurt too much.  However, the doctor noted that in the course of handing the doctor documents to read, the claimant would bend approximately 60 degrees and was able to sit on the examination table with his legs straight out in front of him (Exhibit 44/4).

The claimant's alleged subjective complaints are not supported by his daily activities that include taking care of his personal hygiene, feeding himself, doing laundry, riding a bicycle, cook, washing dishes, grocery shopping, driving a car, playing the guitar, and running errands.  He also reads, writes and watches television (Exhibits 43F/3; 43F/6 and testimony).

The claimant's use of medications does not suggest the presence of impairments that are more limiting than found in this decision.  The claimant's analgesic medication history is inconsistent with his claimed severity of pain.  He has never been maintained on regular prescription of strong analgesics such as morphine, methadone, Fentanyl or Oxycontin.  The claimant testified that he took Motrin for his pain.

The claimant has recovered from his knee pain.  Treating records from August 2009 indicate that the claimant's knee, status post surgery, w[a]s doing better and he had minimal complaints (Exhibit 34F/2).  In September 2009, the claimant reported that he was feeling much better with physical therapy.  He was able to walk on the beach a[n]d ride a bike ([E]xhibit 35F/3).  Physical therapy records from October of that year indicate that goals were achieved and he overall did well in therapy.  He had regained full range of motion of the right knee and had returned to long walks and activities of daily living without pain (Exhibit 35F/3).  Finally, the best evidence of the claimant's knee recovery is the fact that he did not list it as an impairment that caused him pain in his testimony.  Similarly, the claimant has apparently recovered from his wrist pain, as he did not mention it at the hearing when asked where he was having pain.

These findings are indicative that the claimant's complaints are not fully substantiated by the objective medical conclusions and his symptoms may not have been as limiting as the claimant has alleged in connection with this application.

Consequently, the claimant's allegations are not credible to establish more restrictive residual functional capacity than found above.

12CV2590

As for the opinion evidence, as already noted, the medical evidence of record does not support Dr. Green's opinions that the claimant cannot work and has marked mental limitations as to his alleged depression and anxiety (Exhibit 36F). Again, no treating records have been provided. More importantly, though, the undersigned finds Dr. Green not qualified to render the mental assessment opinions because the evidence is that he is a vocational psychologist, not a clinical psychologist. The claimant was given the opportunity to clarify this fact and he failed to do so (Exhibit 45F). Dr. Green's letter to the claimant's representative in February 2011 also contains opinions regarding the claimant's mental health but is likely unsupported in the record. Although not a model of clarity, the letter purports to opine that the claimant is unable to do any work related to the work of a public adjuster (Exhibit 41F/2). A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance: and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight (Social Security Ruling 96-2p). However, statements that a claimant is 'disabled,' 'unable to work,' can or cannot perform a past job, meets a listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein and in the Dictionary of Occupational Titles. Such issues are reserved to the Commissioner. (20 CFR 40d4.1527(d)(2) and Social Security Ruling 96-5p). Furthermore, the record fails [to] support the doctor's opinion that the claimant is incapable of all work in the insurance adjusting field. The undersigned gives Dr. Green's opinions little weight.

Dr. David opined in a Physical Capacities Evaluation dated April 26, 2010 that the claimant could, in an 8-hour day, sit and stand for less than one hour and walk for one hour. He said the claimant frequently needed to change positions while seated, elevate his leg as well as extend it. He also opined that the claimant could not use his feet for repetitive movements in operating foot controls. According to Dr. David, the claimant could lift and carry up to 10 pounds frequently and 11-20 pounds occasionally, could occasionally bend and reach above shoulder level. He was moderately limited in his ability to drive automotive equipment (Exhibit 38F). A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significance: and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight (Social Security Ruling 96-2p). However, the opinion of this doctor appears on a fill-in-the-blank form, with no notes attached to it and Dr. David's records that are found in the record are marginal at best. The doctor failed to cite any medical testing results or objective observations to support his conclusions as to the claimant's residual functional capacity. Furthermore, the opinion of this doctor, who assessed the claimant with the residual functional capacity of less than sedentary work is not afforded any significant weight as this opinion conflicts with the substantial evidence of record, documenting less severe limitations. (Social Security Ruling 96-6p). The doctor did not adequately consider the entire record, including the statements of collateral sources and the objective findings of other treating physicians. The objective evidence in the record does not support the level of severity that this doctor assigns. The undersigned gives it little weight.

Dr. Sabourin, the consultative examiner opined in June 2011 that the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about 6 hours in an 8-hour day and sit for about 6 hours in an

12CV2590

1    8-hour workday.  From a postural standpoint, he could climb, stoop, kneel and
2    crouch occasionally.

3    Psychiatrist Dr. Engelhorn opined in June 2011 that the claimant could perform
     simple repetitive tasks, as well as complex and detailed work.  He could
4    adequately relate to peers and supervisors in the work and make routine
     adjustments.  The doctor "simply did not see significant psychiatric disability
5    in this case" (Exhibit 43F/5).

6    Pursuant to 20 CFR § 404.1527, the undersigned assigns significant weight to
     these opinions, as they are well-supported by the medical evidence, including
7    the claimant's medical history and clinical and objective signs and findings as
     well as detailed treatment notes, which provides a reasonable basis for
8    claimant's chronic symptoms and resulting limitations.  Moreover, the opinions
     are not inconsistent with other substantial evidence of record.  In addition, these
9    physicians are examining sources that are familiar with Social Security Rules
     and Regulations and legal standards set forth therein and best able to provide
     a superior analysis of the claimant's impairments and resulting limitations.

10

11   (Tr. 27-32.)

12   ## V.  STANDARD OF REVIEW

13        A District Court may only disturb the Commissioner's final decision "if it is based on

14   legal error or if the fact findings are not supported by substantial evidence."  Sprague v.

15   Bowen, 812 F.2d 1226, 1229 (9th Cir. 1987); see Villa v. Heckler, 797 F.2d 794, 796 (9th

16   Cir. 1986).  The Court cannot affirm the Commissioner's final decision simply by isolating

17   a certain amount of supporting evidence.  Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th

18   Cir. 1990).  Rather, the Court must examine the administrative record as a whole.  Id.  Yet,

19   the Commissioner's findings are not subject to reversal because substantial evidence exists

20   in the record to support a different conclusion.  See, e.g., Mullen v. Brown, 800 F.2d 535,

21   545 (6th Cir. 1986).  "Substantial evidence, considering the entire record, is relevant

22   evidence which a reasonable person might accept as adequate to support a conclusion."

23   Matthews v. Shalala, 10 F.3d 678, 679 (9th Cir. 1993).  The Commissioner's decision must

24   be set aside, even if supported by substantial evidence, if improper legal standards were

25   applied in reaching that decision.  See, e.g., Benitez v. Califano, 573 F.2d 653, 655 (9th Cir.

26   1978).

27

28

21

12CV2590

1
# VI. <u>DISCUSSION</u>

2      Plaintiff's Motion for Summary Judgment raises three issues: (1) whether the ALJ

3 erred by declining to give greater weight to the opinion of Dr. Green, who Plaintiff alleges

4 was a treating source; (2) whether the ALJ erred by declining to give greater weight to the

5 opinions of Drs. McKeon and David, who Plaintiff alleges were responsible for pain

6 management from his original knee injury and eventual low back degenerative disc disease,

7 as opposed to one-time examiner and non-examining physicians' opinions; and (3) whether

8 the ALJ erred when he failed to ask the vocational expert if there were inconsistencies

9 between her testimony and the Dictionary of Occupational Titles ("DOT").  (Doc. No. 10-1

10 at 2.)

11
## A. <u>THE ALJ PROPERLY DECLINED TO GIVE GREATER WEIGHT TO THE OPINIONS OF DRS. GREEN, MCKEON, AND DAVID</u>

12
13      Plaintiff alleges that the ALJ erred by not giving greater weight to the opinions of Drs.

14 Green, McKeon, and David, all of whom Plaintiff claims were treating sources.  (Doc. No.

15 10-1 at 2.)  Defendant argues that the ALJ properly weighed the evidence.  (Doc. No. 17-1

16 at 7.)

17
## 1. <u>APPLICABLE LAW</u>

18      As a general rule, more weight should be given to the opinion of a treating source than

19 to the opinion of a source who does not treat the claimant.  <u>Lester v. Chater</u>, 81 F.3d 821,

20 830-31 (9th Cir. 1995); <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987).  The rational

21 behind affording the treating physician's opinion greater weight is that "he is employed to

22 cure and has a greater opportunity to know and observe the patient as an individual."

23 <u>Winans</u>, 853 F.2d at 647.  There is a requisite presumption that the opinions of treating

24 physicians are entitled to greater weight than the opinions of examining and non-examining

25 physicians, and that the opinions of examining physicians are entitled to greater weight than

26 the opinions of non-examining physicians.  <u>See</u> 20 C.F.R. § § 404.1527(d); 416.927(d); 20

27 C.F.R. § 404.1527(c); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1283 (9th Cir. 1996.)

28      An ALJ may disregard a treating source's opinion whether or not that opinion is

contradicted.  <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989).  Where the treating

12CV2590

source's opinion is <u>not</u> contradicted by another source, it may be rejected only for clear and convincing reasons. <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1396 (9th Cir. 1991). If the treating source's opinion <u>is</u> contradicted by another source, the general rule is that conflicts in the evidence are to be resolved by the Secretary and that his determination must be upheld when the evidence is susceptible to one or more rational interpretations. <u>Winans</u>, 853 F.2d at 647; citing <u>Sprague</u>, 812 F.2d at 1230. However, when the conflict is between the opinions of a treating source and an examining source, the Ninth Circuit requires that, "[i]f the ALJ wishes to disregard the opinion of the treating physician, he...must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." <u>Murray v. Heckler</u>, 722 F.2d 499, 502 (9th Cir. 1983).

When evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). The more consistent a medical opinion is with the record as a whole, the more weight it is given. <u>See</u> 20 C.F.R. § 404.1527(d)(4). A treating source's opinion on the nature and severity of an impairment is given controlling weight <u>only</u> if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence of record. <u>See</u> 20 C.F.R. § 404.1527(d)(62). The opinion of a consultative examiner that rests on the examiner's own independent examination and clinical findings can alone constitute substantial evidence for rejecting a conflicting opinion from a treating source. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1149. It is then solely the province of the ALJ to resolve the conflict.

The opinion of an non-examining source cannot alone constitute substantial evidence that justifies rejecting the opinion of either an examining or a treating source. <u>Tonapetyan</u>, 242 F.3d at 1149; citing <u>Magallanes</u>, 881 F.2d at 751. However, the opinion of a non-examining source may constitute substantial evidence when it is consistent with other independent evidence in the record. <u>Tonapetyan</u>, 242 F.3d at 1149; citing <u>Magallanes</u>, 881 F.2d at 752. Moreover, in some cases, the ALJ can reject the opinion of a treating or

examining source based in part on the testimony of a non-examining medical advisor.  See Magallanes, 881 F.2d at 751-55.

Therefore, although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.  Tonapetyan, 242 F.3d at 1148; citing Magallanes, 881 F.2d at 751.  In Tonapetyan, the plaintiff argued that the ALJ improperly rejected the opinions of her treating physician in favor of the opinions of examining physicians and non-examining medical experts.  Tonapetyan, 242 F.3d at 1147.  However, the court determined that the ALJ gave sufficient reasons supported by substantial evidence in the record for rejecting the opinion of the plaintiff's treating physician.  Id. at 1149.  The court noted that the ALJ rejected the treating physician's opinion because it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of the plaintiff's alleged conditions.  Id.  The court also identified contrary opinions in the record.  Id.  The Tonapetyan court stated, "[w]hen confronted with conflicting medical opinions, an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings."  Id; citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).

According to the SSA regulations, a "[t]reating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  An "acceptable medical source" may be a licensed physician, a licensed or certified psychologist, a licensed optometrist, a licensed podiatrist, or a qualified speech-language pathologist.  Id; 20 C.F.R. § 404.1513(a).

## 2. THE ALJ DID NOT ERR IN DECLINING TO GIVE GREATER WEIGHT TO DR. GREEN'S OPINION

### a. DISCUSSION

Plaintiff characterizes psychologist Dr. Green as a treating source and argues that the ALJ did not give appropriate weight to his opinion.  (Doc. No. 10-1 at 5.)  He argues that giving appropriate weight to Dr. Green's opinion would require that Plaintiff's mental

12CV2590

impairments be considered severe, and thus they were improperly omitted from consideration in the ALJ's RFC finding.  Id. at 8.

Defendant argues that the ALJ's RFC finding is supported by substantial evidence in the record and should be affirmed.  (Doc. No. 17-1 at 13.)  Defendant contends that Dr. Green provided mere conclusions without any treatment records, objective findings, or medical evidence in support of his opinion, and therefore, the ALJ was not required to give greater weight to his opinion.  Id.

Plaintiff claims that Dr. Green is a licensed psychologist, and therefore, his opinion should have been given proper weight.  (Doc. No. 10-1 at 6-7.)  Plaintiff claims that the ALJ disregarded Dr. Green's opinion because he referred to himself as a "vocational psycholo- gist," rather than a "clinical psychologist."  Id. at 5.  Plaintiff argues that pursuant to SSA regulations, a licensed psychologist is an acceptable medical source permitted to establish the presence of a medically determinable impairment, and the regulations do not discriminate between clinical psychologists and vocational psychologists.  Id. at 5-6.  Plaintiff asserts that Dr. Green, "is still a practicing licensed psychologist...(who has) been treating [Plaintiff] since 2004.  Treatment at this time consists of twice-weekly telephone psychotherapy treatment."[15/]  Id. at 5-6; citing Tr. 1092.

Plaintiff argues that while Dr. Green did not provide treatment notes, the record is full of Dr. Green's summaries describing Plaintiff's lack of progress.  (Doc. No. 10-1 at 6.)  Plaintiff asserts that these summaries are not mere conclusory statements, but rather, they refer to Dr. Green's ongoing interactions with Plaintiff, and "certainly serve the same function office notes serve - contemporaneous observations by a treating source of his patient."  Id.  Further, Plaintiff argues that there are several other mental health professionals who offered contemporaneous opinions of his mental limitations.  Id.

---

[15/] On July 29, 2011, Dr. Green wrote a letter to ALJ Steinman, indicating that he is "still a practicing licensed psychologist."  (Tr. 1092.)  However, an August 1, 2011 email from Plaintiff's counsel to ALJ Steinman states that, "Dr. Green is now in his eighties and let his license lapse."  (Tr. 736.)  The email  also states that Dr. Green was a licensed psychologist when he treated Plaintiff.  Id.

12CV2590

1    Conversely, Defendant argues that, while the ALJ did consider the opinion of Dr.

2    Green, he properly accorded it little weight. (Doc. No. 17-1 at 7.) Defendant asserts that Dr.

3    Green's opinion was inconsistent with the other medical evidence of record, he failed to

4    provide any treatment records to support his opinion, the majority of his treatment was done

5    by telephone, and he was a vocational psychologist, not a clinical psychologist. Id.

6    Defendant argues that Dr. Green's opinion was inconsistent with the other medical

7    evidence of record which indicated that Plaintiff had no severe mental impairment. (Doc.

8    No. 17-1 at 7, 11, 13.) Defendant notes that examining psychiatrist

9    Dr. Englehorn opined Plaintiff did not have a significant psychiatric disability, as his

10   disability related "almost totally" to his orthopedic problems. Id. at 8; citing Tr. 1073.

11   Defendant also notes that Dr. Englehorn reported that Plaintiff's mental functional

12   limitations, if any, were mild. Id; citing Tr. 1074-75. Defendant argues that Dr. Engelhorn's

13   opinion constituted substantial evidence in support of the ALJ's finding, as his opinion was

14   consistent with the record, and Dr. Engelhorn performed his own, independent examination

15   of Plaintiff and based his findings on that testing. Id. at 9. Further, Defendant asserts that

16   the ALJ determined from the record that Plaintiff had only mild limitations in his activities

17   of daily living, social functioning, concentration, persistence, or pace, and there was no

18   record of any episodes of decompensation of extended duration. Id; citing Tr. 26-27.

19   Defendant claims this evidence further supported the ALJ's finding that Plaintiff had no

20   severe mental impairment. Id. at 9-10; citing 20 C.F.R. § 404.1520(a)(d)(1).

21   Moreover, Defendant argues that Dr. Green failed to provide any treatment records

22   to support his opinion. (Doc. No. 17-1 at 7.) Defendant notes that Dr. Green merely

23   provided summaries in the form of letters that he wrote to Plaintiff's counsel and what

24   appears to be an insurance company. Id; citing examples Tr. 982-91; 1062-64. Thus,

25   Defendant contends, Dr. Green's statements that Plaintiff could not work were conclusory

26   and not supported by progress notes. Id. at 12-13. Defendant argues that conclusions of

27   disability, as provided by Dr. Green, are left to the Commissioner, and not to a medical

28   opinion. Id. at 12; citing 20 C.F.R § 404.1527(e).

1    Finally, Defendant argues that Dr. Green cannot be considered a treating source

2    because he treated Plaintiff mostly by telephone, and he was a vocational psychologist.

3    (Doc. No. 17-1 at 7; citing Tr. 29-31.)   Defendant asserts that these are two additional

4    reasons cited by the ALJ in his decision to give little weight to Dr. Green's opinion.  Id. at

5    7, 11-12; citing Tr. 29-31.

6                                     **b. RULING**

7            While Plaintiff is correct that a treating physician's opinion is generally afforded the

8    greatest weight in disability cases, that opinion is not binding on an ALJ with respect to the

9    existence of an impairment or the ultimate determination of disability.  Magallanes, 881 F.2d

10   at 751.  The Commissioner directs that an ALJ is not required to give controlling weight to

11   a treating physician's opinion unless it is well-supported and not inconsistent with other

12   substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) ("If we find that a treating

13   source's opinion...is well-supported...and not inconsistent with the other substantial evidence

14   in your case record, we will give it controlling weight"); Social Security Ruling ("SSR") 96-

15   2p (same).  Here, the ALJ noted that Dr. Green's opinion was inconsistent with the other

16   medical evidence in the record, which indicated that Plaintiff did not have a severe mental

17   impairment. (Tr. 29-31.)  Dr. Green's opinion was not only inconsistent with the examining

18   opinion of psychiatrist Dr. Englehorn, it was also contrary to the evidence in the record that

19   Plaintiff did not take any medication for his alleged mental health condition, and he had

20   never been hospitalized for depression, anxiety, or any other mental impairment.  (Tr. 29.)

21   Further, Dr. Green's opinion was inconsistent with the record evidence that, despite having

22   lived in California for approximately five years, Plaintiff never sought treatment from a

23   therapist within the state. (Tr. 29-31.)  See 20 C.F.R. § 404.1527(d)(6) (When deciding how

24   much weight to give a medical opinion, factors which tend to support or contradict the

25   opinion are considered).

26          The Court is persuaded by Defendant's arguments.  The medical evidence of record

27   does not support Plaintiff's allegations of disabling mental impairment.  To support his

28   claims of disability due to mental impairment, Plaintiff relies primarily on statements

12CV2590

provided by Dr. Green, a vocational psychologist. The ALJ questioned Dr. Green's qualifications as a treating source because he was a vocational psychologist, not a clinical psychologist. (Tr. 30-31, 202, 260.) The ALJ was also concerned that Dr. Green's only recent treatment of Plaintiff appeared to have been by telephone. (Tr. 29.) However, the ALJ determined that, even if Dr. Green was a licensed clinical psychologist, he failed to provide any treatment records to support his conclusion that Plaintiff is unable to work, or has marked limitations in mental functioning. (Tr. 29.) Further, the ALJ observed that Dr. Green's only recent treatment of Plaintiff appeared to have been by telephone. Id.

Moreover, Dr. Green's opinion is contradicted by the opinion of Dr. Engelhorn, examining psychiatrist. After examining Plaintiff, Dr. Engelhorn determined that Plaintiff could perform simple repetitive tasks, as well as complex and detailed work. (Tr. 1073.) He found that Plaintiff could adequately relate to peers and supervisors in the workplace and make routine adjustments. Id. Dr. Engelhorn "simply did not see significant psychiatric disability in this case." Id.

When, as here, there is a conflict between the opinions of a treating source and an examining source, the ALJ may disregard the opinion of the treating source only if the ALJ sets forth specific and legitimate reasons supported by substantial evidence in the record for doing so. Lester, 81 F.3d at 830. In this case, the ALJ did provide specific and legitimate reasons supported by substantial evidence in the record for rejecting Dr. Green's opinion. The ALJ noted that Dr. Green did not support his limitations with reference to any specific findings. (Tr. 30-31; see Magallanes, 881 F.2d at 751) (a lack of supporting clinical findings is a valid reason for rejecting a treating physician's opinion). In February of 2011, Dr. Green sent a letter to Plaintiff's counsel and suggested that Plaintiff was unable to do any work related to the work of a public adjuster, or to work at all. (Tr. 30, 1062-64.) As the ALJ found, however, statements that an individual is "disabled," "unable to work," or "unable to perform a past job," are administrative findings reserved to the Commissioner. (Tr. 31.) See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (the ALJ need not accept the opinion

1  of any source, including a treating source, if that opinion is brief, conclusory, and

2  inadequately supported by clinical findings.)

3       Instead of supporting his limitations with examination findings or test results, Dr.

4  Green relied mainly on Plaintiff's subjective reports.  In July of 2007, Dr. Green completed

5  forms indicating that Plaintiff had some marked limitations in mental functioning and was

6  unable to work.  (Tr. 1038-44.)  The ALJ referenced Dr. Green's lack of treatment notes,

7  noted that Dr. Green's summary statements were actually letters, and observed that Dr.

8  Green provided only conclusory statements. (Tr. 30-31.)  See Tonapeytan, 242 F.3d at 1149

9  (ALJ properly rejected the treating physician's opinion because it was "unsupported by

10  rationale or treatment notes, and offered no objective medical findings to support the

11  existence of claimant's alleged conditions.")  The ALJ also noted that Plaintiff does not take

12  any medication for his alleged mental health condition, and there was no evidence that he

13  has ever been hospitalized for depression, anxiety, or any other mental problem.  Id.

14  Considering all of the evidence, the ALJ found Plaintiff's mental impairment to be

15  nonsevere.  He noted that this conclusion is supported by the opinion of psychiatric

16  consultative examiner, Dr. Engelhorn. Id.

17       Moreover, the ALJ found that Dr. Green was not qualified to render the mental

18  assessment opinions because the evidence is that he is a vocational psychologist, not a

19  clinical psychologist. (Tr. 30.)  The ALJ noted that Plaintiff was given the opportunity to

20  clarify this fact and he failed to do so. Id.  In a July 29, 2011, letter to ALJ Steinman, Dr.

21  Green wrote that he is still a practicing licensed psychologist. (Tr. 1092.)  However, in an

22  August 1, 2011, email, Plaintiff's counsel wrote to ALJ Steinman that Dr. Green is in his

23  eighties and has let his license lapse. (Tr. 736.)  Plaintiff's counsel stated that Dr. Green was

24  a licensed psychologist when he treated Plaintiff. Id.

25       The ALJ noted in his assessment that he did not find Plaintiff to be fully credible.  (Tr.

26  30.)  Plaintiff has not challenged the ALJ's finding that his subjective complaints were less

27  than fully credible. See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 602

28  (9th Cir. 1999) (physician's opinion based to a large extent on claimant's own accounts of

1  symptoms and limitations may be disregarded where those complaints have been properly

2  discounted).

3      The SSA regulations state that a licensed psychologist may be an acceptable medical

4  source to qualify as a treating source.  20 C.F.R. § § 404.1502, 404.1513(a).  Plaintiff is

5  correct that the regulations do not distinguish between a vocational psychologist and a

6  clinical psychologist.  However, the record is unclear as to whether Dr. Green is a licensed

7  psychologist.  The Court need not determine whether Dr. Green qualifies as a treating source

8  here because, as discussed above, even if Dr. Green was a treating source, the ALJ did not

9  err in declining to give greater weight to his opinion.  Thomas, 278 F.3d at 957 (An ALJ may

10 reject the treating physician's opinion because it was based on the claimant's discredited

11 subjective complaints.)

12     Plaintiff urges the Court to rely on Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996),

13 and likens the facts of Smolen to the facts at issue here. (Doc. No. 10-1 at 15.)  However, in

14 Smolen, the Ninth Circuit noted that, although it appeared that the ALJ considered the

15 treating physicians' opinions as controverted, the opinions of both treating physicians were

16 actually uncontroverted.  Smolen, 80 F.3d at 1286.  The Ninth Circuit determined that

17 because the opinions of the two treating sources were uncontroverted, they were entitled to

18 great weight. Id.  Moreover, because the treating physicians' opinions were uncontroverted,

19 the ALJ could reject those opinions only on the basis of clear and convincing reasons,

20 supported by substantial evidence.   Id.  Here, Dr. Green's opinion is contradicted by

21 examining psychiatrist Dr. Engelhorn, and therefore, the Court cannot rely on the reasoning

22 in Smolen.

23     The Court finds that the ALJ gave specific and legitimate reasons supported by

24 substantial evidence in the record for according little weight to Dr. Green's opinion.  The

25 ALJ's RFC assessment was supported by the opinion of Dr. Engelhorn, and objective

26 evidence in the record.  The Court finds that the ALJ properly weighed the evidence in the

27 record and determined that the evidence supports a finding that Plaintiff has no severe mental

28 impairment, nor any related mental limitations.  See Andrews v. Shalala, 53 F.3d 1035, 1041

(9th Cir. 1995) ("[w]here the opinion of the claimant's treating physician is contradicted, and the opinion of a non-treating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the non-treating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.") Accordingly, the ALJ's RFC finding is supported by substantial evidence and is free of legal error.

### 3. THE ALJ DID NOT ERR IN DECLINING TO GIVE    GREATER WEIGHT TO THE OPINIONS OF DRS.    MCKEON AND DAVID

#### a. DISCUSSION

Plaintiff argues that the ALJ erred when he failed to give greater weight to the opinions of Drs. McKeon and David. (Doc. No. 10-1 at 2.) Although Plaintiff does not directly refer to either doctor as his "treating physician," he claims that they were the doctors responsible for pain management related to his original knee injury and eventual low back degenerative disc disease. Id. He also notes that these doctors evaluated him numerous times over many years. Id. at 9. Plaintiff argues, however, that "the most weight in this case was given to a physician who only reviewed the file and never examined or even saw Plaintiff, as he appeared at the hearing by telephone."[16] Id.

Further, Plaintiff argues that his "unassailable work ethic, as demonstrated by his long and productive work history," was not taken into account by the ALJ. (Doc. No. 10-1 at 11. Plaintiff claims that the ALJ failed to address all of the mandatory factors in Social Security Ruling ("SSR") 96-7p,[17] in particular Plaintiff's "stellar work ethic." Id. He also claims that the ALJ improperly relied on "sporadic" daily activities to assess Plaintiff's ability to work on a regular and continuous basis. Id.

Defendant notes that the ALJ properly accorded little weight to Dr. David's opinion because he simply "completed a fill-in-the-blank form with no notes, failed to cite any

---

[16] The Court assumes that Plaintiff refers to Dr. Johnson, the testifying medical expert.

[17] Social Security Ruling ("SSR") 96-7p identifies several factors that may be considered to determine a claimant's credibility. Collins v. Astrue, 2009 WL 1202891 (C.D.Cal. Apr. 27, 2009).

12CV2590

1    medical testing results or objective observations in support of his opinion, and gave an

2    opinion which was unsupported by the objective evidence and which conflicted with the

3    other substantial evidence of record." (Doc. No. 17-1 at 14; citing Tr. 31.) Defendant argues

4    that the ALJ properly determined Plaintiff's physical RFC, and that the opinions of

5    examining orthopedist, Dr. Sabourin, and non-examining medical expert, Dr. Johnson,

6    constituted substantial evidence in support of the ALJ's RFC finding. Id. at 13-14; citing 25,

7    29, 31, 217-19, 1078-84.  As for Dr. McKeon, Defendant argues that Plaintiff fails to state

8    what, if any, functional limitations Dr. McKeon assessed which are not included in the ALJ's

9    RFC finding.  Id. at 14; citing Doc. No. 10-1 at 9-11.

10         Defendant asserts that, although Plaintiff contends that the ALJ should have accorded

11   more weight to Dr. David's opinion because he treated Plaintiff, an ALJ may reject the

12   treating physician's opinion whether or not that opinion is contradicted.  (Doc. No. 17-1 at

13   9-10, 16; citing Magallanes, 881 F.2d at 751.  Defendant argues that Dr. David's opinion was

14   contradicted by the opinions of both Dr. Sabourin and Dr. Johnson.  Id. at 16.  On the other

15   hand, Defendant argues that Dr. Sabourin noted that Plaintiff's chief complaints included

16   pain in the low back, right knee, and right wrist, but that Plaintiff used no assistive device

17   and "essentially is getting no treatment except occasional ibuprofen for his back."  Id. at 14;

18   citing Tr. 1078-79. Further, Defendant notes that, upon examination, Dr. Sabourin observed

19   that Plaintiff walked without any limp and had a normal range of motion of the cervical

20   spine.  Id.  Defendant argues that Dr. Sabourin observed that Plaintiff refused to do any

21   forward flexion or extension for the lumbar spine examination because it would be too

22   painful, but despite Plaintiff's refusal, he bent approximately sixty degrees when handing Dr.

23   Sabourin documents, and Plaintiff was able to sit on the examination table with his legs

24   straight out in front of him.  Id; citing Tr. 30, 1080.  Further, Defendant contends that Dr.

25   Sabourin found no gross deformity in Plaintiff's spine.  Id; citing Tr. 1080.

26         Defendant argues that Dr. Sabourin's conclusions were based on his own review of

27   Plaintiff's records, interview with Plaintiff, and his own examination of Plaintiff, and

28   therefore, his opinions alone constitute substantial evidence to support the ALJ's RFC

12CV2590

finding. (Doc. No. 17-1 at 15.) Thus, Defendant argues, the ALJ found Dr. Sabourin's opinion to be well-supported by the medical evidence and properly accorded it significant weight. Id. at 15. Additionally, Defendant argues that the ALJ also credited the opinion of the non-examining medical expert, who found that Plaintiff could perform a range of light work. Id. at 15-16. Defendant also argues that, because Dr. Johnson's opinion was consistent with Dr. Sabourin's opinion, it also constituted substantial evidence in support of the ALJ's RFC finding. Id. at 16.; citing Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) ("[T]he findings of a non-treating, non-examining physician can amount to substantial evidence, so long as other evidence in the record supports those findings").

## b. RULING

The Court finds that the ALJ's RFC assessment is fully supported by substantial evidence in the record, and the ALJ properly weighed the opinions of Drs. McKeon and David. The ALJ's RFC assessment takes into account the opinions of Drs. Sabourin and Johnson, Plaintiff's examining and non-examining sources. Limiting Plaintiff to a range of light work is consistent with the opinions of both Dr. Sabourin and Dr. Johnson. The ALJ's RFC also addresses Dr. Sabourin's opinion that Plaintiff can sit for 6 hours, and stand/walk for 6 hours during an 8 hour workday. (Tr. 31.)

In a Physical Capacities Evaluation dated April 26, 2010, Dr. David opined that Plaintiff could, in an 8-hour day, sit and stand for less than one hour and walk for one hour. (Tr. 1052.) He noted that Plaintiff frequently needed to change positions while seated, and elevate his leg as well as extend it. (Tr. 31.) He also opined that Plaintiff could not use his feet for repetitive movements in operating foot controls. Id. According to Dr. David, Plaintiff could lift and carry up to 10 pounds frequently and 11-20 pounds occasionally, could occasionally bend and reach above shoulder level, and was moderately limited in his ability to drive automotive equipment. Id. He also believed that Plaintiff has the RFC to perform less than sedentary work. Id.

Dr. David's opinion appears on a fill-in-the-blank form, with no notes attached to it. (Tr. 31.) His records that are included in the record are marginal. Id. Dr. David did not cite

any medical testing results or objective observations to support his conclusions as to Plaintiff's RFC. Id. Further, his opinion conflicts with the substantial evidence of record, which documents less severe limitations. Id. The ALJ found that Dr. David did not adequately consider the entire record, including the statements of collateral sources and the objective findings of other treating physicians. Id. The ALJ noted that the objective evidence in the record does not support the level of severity that Dr. David doctor assigns. Id. After listing the reasons above, the ALJ stated that he gave Dr. David's opinion little weight. Id.

The Court finds that the ALJ properly relied on the opinions of Dr. Sabourin, examining physician, and Dr. Johnson, non-examining physician, and appropriately accorded little weight to Plaintiff's treating physician, Dr. David. Like Defendant, the Court is unclear as to what, if any, functional limitations Dr. McKeon assessed which are not included in the ALJ's RFC finding.[18] Thus, substantial evidence in the record supports the RFC finding.

Plaintiff also argues that the ALJ failed to comply with the requirements of SSR 96-7p, which calls for an evaluation of seven factors in assessing the credibility of a claimant's subjective complaints. (Doc. No. 10-1 at 9.) To the extent Plaintiff argues that the ALJ erred by failing to address each factor set forth in SSR 96-7p, his claim lacks merit. SSR 96-7p identifies seven factors that may be considered to determine a claimant's credibility, including (1) daily activities; (2) location, duration, frequency, and intensity of pain and other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) any other measures the claimant uses or has used to relieve pain or other symptoms...; (7) any other factors concerning functional limitations and restrictions from pain or other symptoms. SSR 96-7p, 1996 WL 374186. However, as discussed in Martinez v. Astrue, 2012 WL 6093509, at 17 (C.D.Cal. Dec. 7, 2012), "an ALJ

---

[18] On December 6, 2005, Dr. McKeon noted, "[Plaintiff] is doing very well. He has had a definite turn around in his life mentally and that has clearly helped his knee. He has baseline crepitus and small effusion but otherwise is doing very well. We will put him on primary restrictions of no repetitive squatting or kneeling or bending, but otherwise, he is going to be functional and do think he can increase his activities as needed." (Tr. 837.)

is not required to discuss and analyze each of those factors." <u>Martinez</u>, 2012 WL 6093509, at 17; citing <u>Vang v. Astrue</u>, 2011 WL 3319548, at 8 (E.D.Cal. Aug. 1, 2011) ("ALJ is not required to discuss and analyze each and every one of the factors enumerated in SSR 96-7p"); <u>Collins v. Astrue</u>, 2009 WL 1202891, at 6 (C.D.Cal. Apr. 27, 2009) (ALJ "was not required to discuss and analyze all of the factors enumerated in SSR 96-7p"; rather, he must only give them "consideration").

Here, Plaintiff specifically argues that the ALJ erred by failing to take into account his "stellar work ethic" and "unassailable work ethic."  (Doc. No. 10-1 at 2, 11.)  SSR 96-7p does not require an ALJ to discuss a claimant's productive work history or work ethic. Additionally, although the ALJ is not required to discuss and analyze each and every factor enumerated in SSR-96-7p, the record as a whole reflects adequate consideration by ALJ Steinman.  For example, testimony was elicited about Plaintiff's daily activities, treatment and medications, and location, duration, frequency, and intensity of pain.

Based upon a reading of the ALJ's assessment, he considered the SSR 96-7p factors when determining that Plaintiff was not fully credible.  The Court finds that the ALJ complied with the requirements of SSR 96-7p.

## C. <u>THE ALJ PROPERLY RELIED ON THE VOCATIONAL EXPERT'S TESTIMONY</u>

Plaintiff argues that the ALJ never asked Dr. Jesko, VE, whether there were inconsistencies between her testimony and the information found in the DOT. (Doc. No. 10-1 at 12; Tr. 510.)  Plaintiff asserts that the Ninth Circuit has stated that failure to inquire pursuant to SSR 00-4p is a basis for reversal absent any other documented error.  <u>Id</u>; citing <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152 (9th Cir. 2007).  Plaintiff argues that at least two identified inconsistencies render this a harmful error.  <u>Id</u>.

Defendant agrees that, pursuant to SSR 00-4p, the ALJ is responsible for asking the VE if her testimony conflicts with the DOT, and for obtaining a reasonable explanation for any apparent conflicts.  (Doc. No. 17-1 at 19.)  However, Defendant argues that this procedural error is harmless if (1) there is no conflict; or (2) if the VE provides sufficient support for her conclusion so as to justify any potential conflicts.  <u>Id</u>.

12CV2590

## 1. <u>APPLICABLE LAW</u>

Social Security Ruling ("SSR") 00-4p states that, "before relying on VE...evidence to support a disability determination...[the ALJ must: [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs...and information in the [DOT]...and [e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4p, 2000 WL 1898704 at 1.

The ALJ has an affirmative responsibility to ask whether a conflict exists between the testimony of a vocational expert and the DOT. <u>See</u> SSR-00-04p, 2000 WL 1898704; <u>Massachi</u>, 486 F.3d at 1152-53. If there is a conflict between the VE's testimony and the DOT, an ALJ may still accept testimony from the VE, but "the record must contain 'persuasive evidence to support the deviation.'" <u>Pinto v. Masanari</u>, 249 F.3d 840, 846 (9th Cir. 2001) (quoting <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995). The ALJ must resolve any conflict by determining whether the VE's explanation is reasonable and provides sufficient support to justify deviating from the DOT. SSR 00-04p; <u>Massachi</u>, 486 F.3d at 1153.

This procedural error can be harmless when there is no conflict, or the VE has provided a basis for relying on her testimony rather than on the DOT. <u>Massachi</u>, 486 F.3d at 1154, n. 19. In <u>Massachi</u>, the ALJ did not ask the VE whether her testimony was consistent with the DOT. <u>Id.</u> at 1152. The Ninth Circuit stated that,

> SSR 00-4p unambiguously provides that '[w]hen a [vocational expert]...provides evidence about the requirements of a job or occupation, the adjudicator has *an affirmative responsibility* to ask about any possible conflict between that [vocational expert]...evidence and information provided in the *Dictionary of Occupational Titles*.

<u>Massachi</u>, 486 F.3d at 1152.

The <u>Massachi</u> court stated that SSR 00-4p "explicitly requir[es] that the ALJ determine whether the expert's testimony deviates from the Dictionary of Occupational Titles and whether there is a reasonable explanation for any deviation." <u>Massachi</u>, 486 F.3d at 1153. However, the court recognized that, in <u>Massachi</u>, an apparent conflict existed between the VE's testimony and the DOT, with no basis for the deviation. <u>Id.</u>

at 1154, n. 19.  The Ninth Circuit stated in a footnote that, "[t]his procedural error could have been harmless, were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts..."  Id.

In Cordray v. Astrue, a Magistrate Judge in the District of Oregon issued a report and recommendation, advising that the District Judge find harmless error where an ALJ failed to ask the VE whether her testimony was consistent with the DOT.  Cordray v. Astrue, 2010 WL 2608331, at 9 (D.Or. 2010).  The Magistrate Judge determined that the plaintiff failed to identify any actual inconsistency between the VE's testimony concerning the demands of a position and the DOT, and no inconsistency was apparent.  Id.  While the plaintiff's hearing was conducted before the Massachi decision was issued, the Magistrate Judge reviewed the hearing transcript and the Massachi decision, and concluded that the ALJ's failure to ask the VE whether her testimony was consistent with the DOT was at most harmless error.  Id.  Moreover, in Barrios v. Astrue, 2010 WL 3825684, 9 (E.D.Cal. Sept. 28, 2010), the court found that it was harmless error when the ALJ failed to inquire as to whether there were any conflicts between the VE's testimony and the DOT.

## 2. **DISCUSSION**

The ALJ did not err in relying on the VE's testimony that Plaintiff could perform the job of insurance claims clerk, a sedentary position.  (Tr. 238-239, 245.) During the VE's testimony, the ALJ failed to inquire whether or not there were any inconsistencies between the VE's testimony and the DOT.  However, at the beginning of Plaintiff's hearing, the ALJ stated that the VE was to determine jobs and numbers and consider conflicts with the DOT.  (Tr. 192.)   The materiality of this procedural error depends on whether, as to the job identified, there existed an apparent unresolved conflict between the VE's opinion and the DOT.

The VE only identified one job that existed in significant numbers in the national economy that Plaintiff could perform based on Plaintiff's age, education, past work, and the ALJ's RFC, which was an insurance claims clerk position.  (Tr. 238-239, 25.)  There was no

1  apparent unresolved conflict between the VE's opinion and the DOT with respect to the

2  claims clerk job.

3  Plaintiff takes issue with the VE's testimony that Plaintiff could perform the semi-

4  skilled job of claims clerk when he testified that he did not use a computer in his former job.

5  (Doc. No. 10-1 at 13-14.)  The VE testified that the use of a computer for the claims clerk

6  position was an unskilled task which could be learned within 30 days.  (Tr. 33, 258.)  The

7  ALJ expressed concern with Plaintiff's testimony that he had never used a computer, despite

8  working in an office with a computer on his desk, and being the president of his own firm.

9  (Tr. 33.)  The ALJ also recognized the discrepancy in Plaintiff's testimony that he used a

10 computer "very little," then later testified that he had never used a computer.  (Tr. 29.)

11 Despite his issues with Plaintiff's inconsistent testimony, the ALJ determined that, even if

12 Plaintiff had never used a computer, he could learn this unskilled task within 30 days of his

13 work as a claims clerk, which would require very little vocational adjustment.  (Tr. 33.)

14 Thus, the Court finds that there was no inconsistency between the VE's testimony and the

15 DOT, and therefore, the ALJ's failure to inquire about inconsistencies pursuant to SSR 00-

16 4p, is harmless error.

17 Accordingly, because there does not appear to be a conflict between the VE's

18 testimony and the DOT, the ALJ committed no reversible error in relying upon the VE's

19 testimony regarding Plaintiff's ability to perform the job of claims clerk notwithstanding his

20 limitations.

21 ## VII. <u>CONCLUSION</u>

22 For the reasons set forth herein, it is recommended that Plaintiff's Motion for

23 Summary Judgment be DENIED.  Further, this Court RECOMMENDS that Defendant's

24 Cross-Motion for Summary Judgment be GRANTED.  This Report and Recommendation

25 will be submitted to the United States District Judge assigned to this case, pursuant to the

26 provisions of 28 U.S.C. § 636(b)(1)(1988) and Federal Rule of Civil Procedure 72(b).

27

28

12CV2590

IT IS ORDERED that no later than <u>October 22, 2013</u>, any party to this action may file written objections with the Court and serve a copy on all parties.  The document shall be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties no later than <u>November 5, 2013</u>.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

DATED:  October 1, 2013

Hon. William V. Gallo
U.S. Magistrate Judge

39

12CV2590